The Honorable, the United States Court of Appeals for the First Circuit is now in session. All persons having any business before this Honorable Court may draw near, give their attendance and they shall be heard. God save the United States of America and this Honorable Court. Thank you for the session, you may be seated. Welcome Judge Lynch, can you hear us? I can, thank you. Okay, and we can hear you. And I'll make sure to ask if you have any questions at the end of each of the proceedings, but I know you'll be participating as we're doing it as well. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is number 22-1067, United States v. Francis Harrington. At this time, would Attorney Cerisi please come to the podium to introduce herself to begin? Good morning. Good morning. I'm June Cerisi for Francis Harrington. This case is about what is reasonable. The facts of this case are not complicated, nor are they really in dispute. The issue before this Court is whether the police actions were reasonable under the totality of the circumstances in Mr. Harrington's particular case. On August 22nd, Mr. Harrington was a passenger in a parked automobile. In the front seat was a man named Mr. Von Mantra. The two men had appeared to be unconscious or sleeping in the automobile, and that prompted an anonymous tip. And the tip to the police was that two men in an area that the police believed to be a high-drug activity area, these two men had left the parked automobile, walked away, then returned and appeared to be unconscious in the vehicle. Counsel, let me ask you, the vehicle here is not moving. It's stationary. What difference is there in this scenario? Let's assume they were found in a park bench in the same condition and the police intervened or in a street corner. Isn't this necessarily not really an auto stop? I think it's been characterized by both parties as an auto stop. But the way I see it, it could be anywhere, and the police could have perhaps still intervened. I agree. It's not an auto stop. But there was some analogy made in the lower court that it would have the same sort of principles that an automobile stop was. So that's why this scenario. And it's also just to set the stage of what occurred. Ms. Teresa, following up on Judge Halby's astute question, isn't your case really not about a stop but about whether under the circumstances and what was known to the officer at the time that he told your defendant to get out of the car, whether that was somehow in violation of his Fourth Amendment rights? Okay? Is that where we start? We may start there, Your Honor, because you're absolutely correct. It wouldn't be any different if they were sitting on a park bench or sitting in this automobile. So this is basically, is this a reasonable under the circumstances, a Terry stop? Is this reasonable? Yes, Your Honor. And under the totality of the circumstances, Mr. Harrington says it is not. And so what was unreasonable about the, we'll tell you that it was an order to get out of the car coming from the police officer, who at that point saw that your client was swaying half-opened eyes, sitting in the car, and that he was reaching down to the center console between the seats. Okay? I think you have to look back at what happened to Mr. Mantra, who was similar with this sluggish, lethargic, ordered out of the car. And who voluntarily got out of the car. Correct. Well, he was asked to get out of the car, but he got out of the car. Yes, so he did. And without assistance. And when asked if he was under the influence of anything, he said no. He had been pat down, no weapons, but then he's free to leave the scene. And I believe this started out as a wellness check. So then attention is turned to Mr. Harrington. And it's true that he is sitting in the car, but he's sluggish, moving slowly, half-shut eyes. And I guess he appeared, the officer couldn't really see, but he's down, he's swaying. And it appears he's looking around the car. And then he's asked to get out of the car. And there may have been a delay, but he does comply and he gets out of the car. And no, he's not looking around the car. He is reaching for something in the car. Even if it appears he's reaching for something in the car. And the door may or may not have been open. So it's not clear what Officer Pittman actually saw. But nonetheless, if it appeared to be reaching, the door opens. And I know there was some testimony that now Mr. Harrington appears to be reaching between the right side of the passenger seat and the door. But clearly Officer Pittman could see at this point in time there's nothing in his hands. Because if there were, we would have heard some testimony about that. So Mr. Harrington gets out of the car. And, again, he's sluggish. And the way he's moving, it's hard-pressed to think it reasonable that this man may be a danger to the police officer. Can you just, before you get to that second piece, I just want to make sure I understand which pieces you're challenging. Are you challenging both the order to get out of the car and then separately to pat down? Yes, but I would like to focus on that pat down, that latter portion of it. I don't think he should have asked him to leave the car. Because I think after he investigated Mr. Vaughn and determined, or at least believed, that no illegal drug activity was going on with Mr. Vaughn Mantra, despite the fact that he had the pinpoint pupils, he let him leave the scene. And I think at that point the whole thing should have ceased. But it didn't. Well, I guess that's what I'm, I think it's a little hard to pin down how you're asking us to evaluate the pat down unless you are asking us in the alternative to do it either way. In other words, even assuming that it was reasonable suspicion to think that he was engaged in drug use and therefore ordering him out of the car was reasonable, nonetheless the pat down was unreasonable. Is that the idea? It is an either or. Okay. And I think these things... Well, can we go, before we get to the or, let's do the either. So on the ask him out of the car, I just want to nail down why you're saying that's unreasonable. It's hard to see how the activity, actions of Harrington after he gets out of the car could bear on whether it was reasonable to order him to get out of the car. So what is it that's unreasonable about asking him to get out of the car or ordering him to get out of the car? Because he was basically sitting there in this... I thought he was swaying. There's been this report. It's in the high drug area. So the concern is that he is intoxicated at the time that he's confronted. And isn't that a reasonable supposition given the circumstances? Or at least hard to say that it's unreasonable to have thought so? Well, I suppose there are different levels of intoxication. And I think in this particular case, because I get the image of a rag doll, the way he's been described, the swaying, slow movement, half-cocked eyes, and the reaching. I don't think that necessarily required him to get out of the car. Well, necessarily is not really the right standard though, right? It's just whether it's reasonable to have suspected that he was intoxicated at that moment, right? I would think it's reasonable for him to believe he's intoxicated, but that's not necessarily criminal activity. Well, if he's intoxicated with an illegal drug, it is, isn't it? It could be. It might be legal drug use. But would it be reasonable to suspect that it was illegal drug use? I would have to concede that. So then when we get to the pat-down, don't we have to take the case with respect to the pat-down on the understanding that at the time of the pat-down, it was reasonable to suspect that the person he was dealing with was intoxicated with an illegal substance and that the substance was the kind of substance that you would inject with? Okay, I'll concede that point for the purpose of this argument. Yes, it might have been reasonable. Okay, so then given if that's the state of the knowledge of the officer at that time, why is it unreasonable to do a pat-down given the concern that there could have been a needle? Because of the way the defendant was moving and the fact that he was patty, wanted to pat down for a needle, that in and of itself seems like a dangerous act. But I don't know that there was necessarily enough information on a type of drug to think that he may be in possession of a needle. And if he's trying to... John, can you hear me? I'm sorry, I can't control the police sirens going by. I see, okay. John, so if I may follow up. I thought that you actually had a good argument that merely being intoxicated, even with illegal drugs, does not justify a pat-down. The use of the illegal drugs is so common in our urban areas that taking the next step of doing a pat-down isn't necessarily reasonable. I thought that the government's case did not depend on that proposition but depended on the proposition that the officer had seen him reaching down in the car. He's ordered out of the car. He's ordered to put his hands up. He puts one hand up. He doesn't put the other hand up. In fact, he appears to be reaching into his pocket for something. And at that point, it seems to me there is a definite suspicion on top of what came earlier that he at least has a needle. Sometimes worse. Maybe it's a gun. But it is something that poses a danger to the officer and to the other people there. And there were medical personnel there. It wasn't just the officer alone. So can you address that aspect of the case? Well, the officer, and I know it's not the subjective belief is not the standard, but the officer didn't think that Mr. Harrington would be armed in the traditional sense with a gun or a knife. The needle, I think, was an afterthought. And what I think the officer was doing was actually looking for evidence of a crime rather than trying to ensure his safety. And again, I understand that reaching down in and of itself would be suspicious, but when you consider the physical state of this defendant, it doesn't appear that he is in very much control of his body. So that's why I'm suggesting that getting him out of the car and then patting him down was not based on reasonable suspicion. Okay, but if you look to Judge LaPlante's opinion, and obviously he was the one who presided over the suppression hearing. In particular, I'm referring to page 6. He's making some findings of fact. And then there's a footnote, particularly a footnote. I believe it's 27. If my eyesight doesn't fail me. Yes, 27. But basically what Judge LaPlante states is that when the door, Officer Pittman consistently testified that Harrington reached down to the floor and Officer Pittman did not know what Harrington was reaching for, which concerned him. So from a reasonable officer perspective, you can react to that, but these are findings of fact. We're not second-guessing. Our standard view for findings of fact, I believe it's clearly erroneous. So why are those findings by Judge LaPlante clearly erroneous so that there's no reasonable suspicion to do the pat-down or do the Terry stop? I don't know that the findings of fact are erroneous, but the application of the law I would suggest is he appeared to be or he was in fact reaching around, but he came up with nothing. And Officer Pittman would see when he left the car that despite these gestures in the car, he didn't come up with anything in his hand to suggest that he had armed himself. And when he got out of the car and he suspected the other, Mr. Von Mantra of being under the influence, he certainly suspected that Mr. Harrington was under the influence. But again, that in and of itself isn't enough to believe that criminal activity is afoot, and I don't think it's reasonable to believe that this man was in possession of an object that might be harmful to the police. Do you concede that if the officer had a reasonable suspicion that your client had a needle, that that would be adequate? You're not challenging that a needle can pose a risk to the officer and other people? The officer testified that in his opinion and his experience, that a needle could in fact be used as a weapon. And it could be used to stab. And you're accepting that proposition? I have to accept that proposition. Yes. Okay. All right. Thank you. Thank you. Thank you. At this time, would Attorney Aframe please approach the podium and introduce himself on the record to begin? Thank you. Good morning. Seth Aframe for the United States. So I think, based on the argument I just heard, that the nub of the dispute really is about the pad frisk, and I'll start by talking about that. So I agree with Judge Lynch that there should not be a bright-line rule that every time there's possible drug use going on, there is reasonable suspicion to conduct a pad frisk. I think there is a separate inquiry that focuses on dangerousness. And I focus both on the possibility of a traditional weapon as well as a needle. Let me start with the traditional weapon. I think it's irrelevant that the officer may have had a subjective belief that there was no traditional weapon. As I understand this Court's decision in Guerrero, we are simply asking the objective question about whether a reasonable officer in this officer's shoes would have been concerned about a traditional weapon. And I think there are a number of facts here that make that concern reasonable. First, there is the nature of the tip, which was not only that the person was passed out, but that they had left the car, gone somewhere, and come back and had passed out, which I think reasonably leads to the possibility that a drug transaction had recently taken place, and this Court has said many times about the association between drug deals and weapons. But most prominently, at least, I think the reaching first to the center console, then the passenger door, then the order to get out of the car, then the defendant being delayed in getting out of the car, then being told to put his hands on his head, and then reaching with one of the hands to the pocket. Can you say for sure that that means he's armed? Of course not. But that's where I disagree with my colleague, in that what we're asking for is reasonable. I just want to understand the sequence. Do we have any factual finding, one way or the other, about whether the officer saw from that reaching anything being picked up? There's no finding. I don't think. So there's no finding. My reading of the record is no. I mean, I think there's no discussion of that in the record. I assume that that would have been a helpful fact to bring out. So what are we supposed to do? Are we supposed to then assume that the officer at the time possessed the information that something had been grabbed, that it was reasonable to think something had been grabbed, that it wasn't reasonable? I'll assume for purposes of this argument, I think the best that we can say is he attempted to reach for something, and that we don't see it. So that's the best you can say. In the government's view, what do we do with it? Does that mean that we then assume that a reasonable officer would have reason to think he did grab something or that he didn't? I think that's significant. It's not because whether he succeeded in reaching for something, but at least he tried to reach for something. Then he gets out of the car and is now reaching for his pocket for possibly something else. He may have failed. So what's the significance of the first reach? I can understand the second one. What's the point of the first reach? It could be that he tried to get some other thing on the floor and didn't get it. So then how would that suggest that now reaching for the pocket, that would seem to undermine the reason to be suspicious of reaching for the pocket. I think it could give additional concern for reaching for the pocket. Frankly, Judge Barron, I think reaching for the pocket in and of itself. Okay, so the reach for the pocket is the moment? I think that's it. May I? I think there were no specific findings as to whether the two incidents of reaching the center console and the door, there was no finding that the officer was convinced nothing had been put into his pocket as a result of those two reaches. And then he gets out of the car. He's ordered to raise his hands. He doesn't. Instead he reaches for his pocket. I want to go back to that. I'm sorry. Go ahead, Judge Lentz. It's simply that the record doesn't tell us one way or the other. And so I'm not sure one can draw the inference that only the reaching for the pocket outside of the car is relevant here. Well, that's why I would just want to get the government's position on this because I'm not sure what we do under the case law. I think the way Judge Lentz has described the record is perfectly accurate. So does that mean we then take it that from an objective perspective, without the record being clear one way or the other on what the officer's view about what the effect of the reaching in the car was, does that mean from an objective perspective we assume that it's reasonable for the officer to be concerned about that or not? I think that when you have somebody who's attempting to reach for something out of the view of the officer multiple times and then gets out of the car and is, again, not following instructions and reaching for something, we don't know where the weapons are, right? And so he's clearly in some sort of inebriated state. So those could have been failed attempts to get the weapons. We just don't know. But he is engaging in furtive behavior that is concerning, and then he gets out of the car and does it again. We don't know where the weapon is, but that's the problem. Let me ask you, from a legal standpoint, is it objectively reasonable in these circumstances when somebody is under the influence of what the officers perceive, it's pretty under the influence, and it's a high-crime area, and in the high-crime areas there may be knives, weapons, drugs, or it can be a needle because he's, you know. Is that objectively reasonable to simply frisk him under those circumstances? I assume that's your position. I mean, that's the bottom line position, right, is that this is an ambiguous situation. So I don't want to overstate it. I mean, it's an ambiguous situation. And it goes to officers' safety, just safety first, and if there's nothing there, let him go or whatever happens. Correct. Right. So I think there's enough here that it is reasonable to be concerned about the officer's safety. I'm just trying to pin down. And the reason why is multiple furtive gestures in the car, inebriation, possible drug deal, and now I have given, I, the officer, have given an explicit instruction to put your hands on your head and your movement is to your pocket, and very well could be that he's cold. You know, it could be any number of reasons, but it could be a weapon. And that's what this area of the Terry stop is concerned about, and I think we have to be sensitive still to the relatively small intrusion on privacy worked by the FRISC weighed against the potentially catastrophic risk if it's something worse than, you know, what one, you know, than sort of the benign possibilities that exist. They clearly exist, but that's really what we're dealing with here, and that's the policy reason that I think this is not a particularly high standard because of the risk on one side. Last question. In the way you're framing it, one possibility is that because of the nature of the intoxication, it was reasonable to assume that he was using a substance that you inject, which would add to the notion that what he would have had on him was a needle. Is that part of the government's case, or is that irrelevant, that we should look at it from the more general perspective of drugs and the association between guns and drugs generally? So I didn't agree sort of the district court went right to the needle. I think the needle is a justifiable argument. I didn't, frankly, agree that we should just, nay, say the possibility of a more traditional weapon like a gun or a knife. However, your question is does his intoxication add to everything else that I just said because a needle too is a weapon. Yes, so a needle, given that he appears to be in an active state of intoxication after what appears, based on the tip, to have been recently acquiring drugs, makes the likelihood of a needle weapon even more likely. And on the needle point, have we held, or do you know what the state of the case law is about whether it's appropriate to treat the prospect of there being a needle as the equivalent of a knife or a gun? So I cited what I found, which was a series of, I did not cite state cases that do exist, but I cited the federal authority. I did not find a circuit case that held one way or the other. I did find district court authority that said that it was a weapon. And there's no contrary authority you've come across? I did not find contrary authority, but, you know, to be perfectly frank, Judge Lynch was sort of getting at that. She asked the other side whether they conceded, and I assume Judge Lynch asked that question because it's not an overwhelming amount of case law on that point. Let me ask you, you said there's some state law. Is that state law, or is it state courts interpreting federal law under Terry? I guess it was, well, I think it was both. I don't think they got, I guess it would be under Fourth Amendment saying, Terry, I can't remember if those said, I don't think they said alternative ground of the state constitution. I don't think they did. But there are multiple district court cases that hold it. I just do think that there's no need, in my view, based on these facts, for this court to decide if you think that's a controversial question to decide that, because I think the gun, more traditional weapon, is certainly in play here. But does it matter that there was no, I mean, he's pretty close to him, and there's no, I mean, a gun would kind of be pretty visible in the pocket. There's a bulge in the, I mean, where the drugs are is described as a bulge. In his pocket. In his waistband. I see. So it ends up being drugs. Counsel, just as a matter of fact, fentanyl seems to have overwhelmed New England and New Hampshire in particular. And I understand it to be a particularly dangerous drug. If fentanyl, a needle is used to inject fentanyl, and there is still fentanyl on the needle, does that pose a type of risk that is not present for older categories of drugs? It absolutely does. There have been various changes that I'm aware of in my time doing this work as how police will deal with fentanyl when they find it, how they will handle it, because these risks are there. So, yes, it is a very dangerous drug. And that's why the officer talked about the needle. I mean, I appreciate that. The officer, from a subjective perspective, which I have argued is irrelevant, but just from a subjective perspective, on the ground, in Manchester, dealing with an intoxicated person, what risk does he say? Can I just ask you whether this matters? And I know this has come up to some extent in the context of jurisdictions where gun possession is lawful, as to how to think about the armed and dangerous pairing of words. So if the thought is that the person has a knife or a gun, the notion that the person is not just armed, particularly if it's illegal to have those things, but armed and dangerous, has been pretty conventionally thought to be an easy question. Does the government have a view about how to think about the needle? Because, of course, the reason for the needle being on the person is not the same way that the reason for a knife or a gun to be on the person would be, which is protection, or used to ward off somebody. The needle's there to inject. Now you're asking us to treat it if we were to make the needle a point. The needle's clearly dangerous. But is it right to think of the possession of any item that could pose a danger to an officer as an item that, therefore, triggers the armed and dangerous categorization that justifies a pat down under Terry? So I guess I don't know that I want to answer that as directly as you just asked it, because I think the problem is now you have somebody who I agree with you didn't have the needle at the beginning, because he thought today what I'm going to try to do is prick the officer. But now he's in a moment when things are going badly for him, and now he has something that he could use in that way. So what you're saying is in these pat downs it's officer safety first. It could be the needle. He could have this pen, and with the pen he can try to strike the officer in an eye or something, and the pen normally is not a weapon, but I can turn this pen into a weapon. It could be anything. It could be a small Boy Scout knife. It could be a hundred different things. It could be. But are you suggesting that you can pat down people to see if they have a pencil? So that becomes problematic. No, I can't take that position. So how do you draw the line? Counsel, I understood you to say that in all of the circumstances, some effort to strike back, to try to get away from the officers, has to be factored in on these particular facts. Other facts maybe not. Did I understand that correctly? Yes. I mean, all of this is contextual, totality of the circumstances. Not complying is an important fact. Put your hands over your head. He doesn't do it. All of these things taken together is what raises the concern. And, again, I understand the area, well, he's intoxicated. He's not, you know, in his right mind. But these are we don't know what someone in that situation is going to do, and it's all of that taken together. I don't think you can isolate one thing and say, well, that's it. It's the story, and the story is someone not complying. Okay. Counsel, if I may, so why does the government, in its brief, have a footnote about community policing when the Supreme Court has reversed the First Circuit and rejected that doctrine? Question one. Question two, why did the government approach this case as though it were the same as stopping a vehicle? So I guess I viewed it more as a Terry stop. I don't think it was a consensual community encounter where the people were free to leave. So I guess I thought of it in those terms. They were certainly in a car, so how the Wilson argument that you can get someone out of the car when you make a traffic stop, I guess that's kind of a complicated question, I guess, because they were in a car. The car was stopped, but I don't see why the differences of getting out of the car change. But I thought basic Terry stop analysis applied. I'm looking for my footnote about community caretaking. So you would be saying that Maryland versus Wilson does apply to this type of scenario, even if the car is not moving, they don't intend to move it. I guess I didn't think about that as deeply as maybe I should have, but I guess at the end of the day, I didn't think the concerns that that case is talking about had to do with the previous movement of the car. I thought it was people in a car, further movement, you can't see what they're doing. Those are all justifiable reasons to just get somebody out of the car if you have a basis to be detaining them. And I thought that's really what we were talking about. I guess I'm looking for my footnote. I know the court talked about community caretaking. I don't think I did. I could be wrong. Okay. But the court did. So you agree that it's largely irrelevant. Yes, I didn't see the case that way. I saw it as a standard Terry stop. Okay, thank you. Thank you. Anything further? No. Thank you. That concludes arguments in this case.